IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| B. P. GREER RECYCLING, INC. | ) | CASE NO. 15- 11192 |
| | ) | Chapter 11 |
| Debtor. | ) | |

MOTION FOR ORDERS PURSUANT TO SECTIONS 105(a), 363, 365, AND 1146 OF
THE BANKRUPTCY CODE (A) AUTHORIZING AND SCHEDULING AN AUCTION
AT WHICH DEBTOR WILL SOLICIT BIDS FOR THE SALE OF ITS ASSETS; (B)
APPROVING PROCEDURES FOR SUBMISSION OF COMPETING BIDS; (C)
APPROVING BREAKUP FEE PROVISION; (D) SCHEDULING A HEARING TO
CONSIDER APPROVAL OF SUCH SALE AFTER BIDDING PROCESS HAS BEEN
COMPLETED; (E) APPROVING THE FORM AND MANNER OF NOTICE OF
AUCTION PROCEDURES AND SALE HEARING; (F) AUTHORIZING THE OPENING
BID AMOUNT IN FAVOR OF FOSS INDUSTRIAL RECYCLING, LLC, (G)
AUTHORIZING THE SALE OF THE ASSETS TO BE FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES AND OTHER CLAIMS OF INTEREST AND
TRANSFERRING SUCH CLAIMS TO THE PROCEEDS OF SALE; (H) APPROVING THE
FORM OF THE ASSET PURCHASE AGREEMENT; (I) APPROVING THE LEASE AND
OPERATING MANAGEMENT AGREEMENT; AND (J) GRANTING RELATED RELIEF
INCLUDING, IF NECESSARY, A HEARING UNDER 11 U.S.C. § 506

NOW COMES B. P. GREER RECYCLING, INC., Debtor in Possession (hereinafter
"Debtor"), and respectfully requests authorization pursuant to 11 U.S.C. §§ 105, 363, 365, 1146,
and other applicable sections of the United States Code and pursuant to Rule 6004 of the Federal
Rules of Bankruptcy Procedure for the Court to enter Orders (A) Authorizing and Scheduling an
Auction at Which Debtor Will Solicit Bids for the Sale of its Assets; (B) Approving Procedures
for Submission of Competing Bids; (C) Approving Breakup Fee Provision; (D) Scheduling a
Hearing to Consider Approval of Such Sale After Bidding Process Has Been Completed; (E)
Approving the Form and Manner of Notice of Auction Procedures and Sale Hearing; (F)
Authorizing the Opening Bid Amount in Favor of Foss Industrial Recycling, LLC;   (G)
Authorizing the Sale of the Assets to be Free and Clear of All Liens, Claims, Encumbrances and
other Claims of Interest and Transferring Such Claims to the Proceeds of Sale; (H) Approving

the Form of the Asset Purchase Agreement; (I) Approving the Lease and Operating Management Agreement; and (J) Granting Related Relief including, if necessary, a Hearing Under 11 U.S.C. § 506. (The Order granting the relief requested herein is hereinafter referred to as the "Auction and Sales Procedures Order") and, in support thereof, shows unto the Court the following:

## Jurisdiction

1. The Debtor filed a voluntary petition under Title 11, Chapter 11 of the United States Bankruptcy Code on October 30, 2015 (the "Petition Date"). As a result of that filing, the Debtor is now operating as a debtor-in-possession.

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105, 361, 363, 364, 365, 506, 1107 and 1108.

3. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N) and (O), and the Court may enter final orders in response to this Motion.

## Background

4. The Debtor is a North Carolina corporation with its principal place of business located at 219 Watlington Drive, Reidsville, Rockingham County, North Carolina. The Debtor is engaged in the business of buying and selling scrap metal for commercial use. The Debtor was unable to pay debt obligations owed to Carolina Bank, which resulted in Carolina Bank initiating a lawsuit in the General Court of Justice, Superior Court Division, of Guilford County, North Carolina, against certain parties, including B. P. Greer Recycling, Inc. The complaint was filed on or before June 15, 2015. As a result of that filing and by and with the consent of the Debtor's owner and the other defendants, the Superior Court entered a Preliminary Injunction and appointed Thomas J. McGoldrick, CTP, CIRA, CDBV as Receiver. The Receivership Order was entered on June 15, 2015, and has been in effect since that date, and the Receiver has continued to manage the affairs of the Debtor.

5.      In fulfilling his obligations the Receiver determined that the Debtor would not be able to continue to operate in the ordinary course of business or maintain its operational affairs without additional financing, and it did not appear that additional financing would be available. Therefore, the Receiver, shortly after being appointed, initiated efforts to market the Debtor's business and investigate the potential to sell substantially all its assets.  As a result of those efforts, the Receiver has obtained an offer pre-petition for the purchase of certain described assets of the Debtor.  The offer contemplates the Debtor filing a petition for relief under Title 11, Chapter 11 of the United States Code, and for the offer to be deemed an opening bid at an auction sale based upon certain preapproved sale procedures.

6.      As of the Petition Date, there were two (2) non-purchase money security interest claims of lien on the Debtor's assets. A primary claim of lien is held by Carolina Bank.  Upon information and belief, Carolina Bank is claiming an indebtedness is owed to it in an amount equal to or greater than $9,300,000.00.  Furthermore, Carolina Bank is claiming it has a secured interest on the Debtor's real estate and all personal property.  The history of the debt of the loans which originated in 2003 with Carolina Bank is as follows:

a.      On or about August 7, 2013, Carolina Bank made a written commitment (the "2013 Loan Commitment") to make three loans (the "2013 Loans") to B. P. Greer Recycling, Inc. for up to $9.3 Million (in the aggregate).   The 2013 Loans included Carolina Bank Loan Numbers 213315, 213316 and 213317.

b.      Brian P. Greer, in his capacity as President of B.P. Greer Recycling, Inc., signed the 2013 Loan Commitment on August 30, 2013.

c.      On or about August 30, 2013, Carolina Bank closed the 2013 Loans to B. P. Greer Recycling, Inc.  In connection with the closing B. P. Greer Recycling, Inc. and Carolina Bank entered into numerous agreements, including without limitation a Business Loan Agreement (the "2013 Business Loan Agreement") governing the administration of all three of the 2013 Loans, a Commercial Security Agreement (the "2013 Commercial Security Agreement") securing advances under all three

of the 2013 Loans, a Deed of Trust (the "2013 Deed of Trust") securing advances under all three of the 2013 Loans, and an Assignment of Rents (the "2013 Assignment of Rents") securing advances under all three of the 2013 Loans.

d.  To evidence its indebtedness to Carolina Bank, B.P. Greer Recycling, Inc. also executed three promissory notes on August 30, 2013, one for each of the three 2013 Loans: (a) Promissory Note for Loan Number 213315 ("Note No. 213315") in the principal amount of $4.3 Million; (b) Promissory Note for Loan No. 213316 ("Note No. 213316") in the principal amount of $2 Million; and (c) Promissory Note for Loan Number 213317 ("Note No. 213317"), a revolving line of credit permitting future advances up to $3 Million.

e.  On January 7, 2014, Carolina Bank made Loan Number 213469 (the "2014 Loan") to B. P. Greer Recycling, Inc. in the principal amount of $1 Million.

f.  In connection with the closing of the 2014 Loan, B. P. Greer Recycling, Inc., executed a Business Loan Agreement (the "2014 Business Loan Agreement") governing the administration of the 2014 Loan, a promissory note (the "2014 Promissory Note) in the principal amount of $1 Million, and a Commercial Security Agreement (the "2014 Commercial Security Agreement") securing repayment of the 2014 Promissory Note.

g.  As a result of certain alleged defaults to the 2013 Loans, Carolina Bank initiated litigation in the General Court of Justice, Superior Court Division for Guilford County, North Carolina (Case No. 15 CVS 56482) on or about June 15, 2015. As a result of the filing of the Complaint, the Debtor, along with other defendants and Carolina Bank, entered into a Consent Order which appointed Thomas J. McGoldrick of Anderson, Bauman, Tourtellot & Vos, as Receiver. The Receiver continued in that capacity up to the date of filing of the Debtor's petition.

7.     G. R. Funding, LLC, Quintium Private Opportunities Fund, LP., and Third Avenue Special Situation (Master) Fund, LP (upon information and belief, the successor in interest to Carolina Financial Securities and individual interests in Carolina Financial Securities) (hereinafter referred to as "G.R. Funding"), individually and/or collectively are claiming a secured interest against the Debtor's assets.  G.R. Funding filed a judgment against the Debtor in Rockingham County, North Carolina and may claim a secured interest pursuant to other documents.  Upon information and belief, an amount equal to approximately $510,000 is claimed by said creditor to be owed as of the Petition Date.

8.     Upon information and belief, the G.R. Funding's secured debt obligation originally resulted from funds borrowed for the purpose of purchasing a large item of machinery and was later restructured as the result of a mediated settlement agreement entered into by the parties on or about March 25, 2015.

9.     There exists a bona fide dispute as to whether G.R. Funding has a secured claim and, if so, if it is properly perfected.  This dispute exists by and between the Debtor and G.R. Funding. Upon information and belief, the position of Carolina Bank also creates a bona fide dispute. Its position is its lien is superior to any lien claim of G.R. Funding and/or any claim that the Debtor could make as a result of avoiding said lien pursuant to the Bankruptcy Code including, but not limited to, 11 U.S.C. §§ 544 and 551.

10.     In addition, the following creditors may have security interest liens and/or tax liens on equipment owned by the Debtor, and their claims of lien can be transferred to proceeds of sale pursuant to 11 U.S.C. §§ 363(f)(3) or (f)(4).

a.     Caterpillar Financial Services Corp.
P. O. Box 13834
Newark, NJ 07188-0834
Alleged Indebtedness:  $182,101
Collateral: Excavator

     b.      Commercial Credit Group, Inc.
              P. O. Box 60121
              Charlotte, NC 28260-0121
              Alleged Indebtedness:  $67,714.65
              Collateral:  Tumbleback/Downstream

     c.      Wells Fargo Equipment Finance Manufacturer Services Group
              P. O. Box 7777
              San Francisco, CA 94120-7777
              Alleged Indebtedness:  $17,834.00
              Collateral:  (1) Clark F1 Forklift, (1) Clark F9 Forklift

     e.      Rockingham County Tax Collector
              P. O. Box 580368
              Charlotte, NC 28258-0368
              Property taxes for 2014 (Unpaid Amount)

11.    At the time of filing, the Debtor owed $0.00 in priority wage debts, $54,886.69 (property tax) in priority tax debts, and $357,426.30 to anticipated general unsecured creditors. The owner of the Debtor, Brian Powell Greer, may have issued guaranties for one or more of the creditors of the Debtor, however, said individual filed a petition for relief under Title 11, Chapter 7 of the United States Bankruptcy on October 13, 2015, in the Middle District of North Carolina (Case No. B-15-11118).

12.    The Debtor intends to sell substantially all of its tangible and intangible assets, including certain parcels of real property, to Foss Industrial Recycling, LLC ("Foss"), subject to Bankruptcy Court approval and a Court approved auction process.  The parties desire an expedited process because the Debtor has no funds to operate and the parties desire to close the sale on or before December 22, 2015.

**GENERAL TERMS OF THE ASSET PURCHASE AGREEMENT**

13.    The general terms of the Asset Purchase Agreement are summarized below.  The reader and any prospective purchaser of the Sale Assets are urged to read and review the Asset Purchase Agreement in its entirety for a complete and thorough understanding of all its terms and

conditions.   (The Asset Purchase Agreement is an exhibit to the McGoldrick Affidavit filed contemporaneously with this motion. It is incorporated herein by reference.)

Sale Assets:

A.     The assets to be sold consist of (collectively, subparagraphs i. and ii. below and shall be referred to as "Sale Assets"):

i.     Real estate located at 219 Watlington Drive, Reidsville, North Carolina, being all of Lots 1, 2 and 3 as shown on plat recorded in plat book 67, page 85 Rockingham County Registry; along with those access and utility easements described in documents recorded in book 851, page 1466 and book 1416, page 2399 Rockingham County Registry (the "Real Property").

ii.     All tangible personal property consisting of, among other things, machinery, equipment, and inventory wherever located and office machinery/equipment and supplies located at the office.  Furthermore, certain additional specified and tangible assets and intangible rights are a part of these Sale Assets.  The Debtor has simultaneously filed with this Motion an Affidavit for the purpose of authenticating the Asset Purchase Agreement by and between the Debtor and Foss Industrial Recycling, LLC.  Said Asset Purchase Agreement provides the specific detail as to the assets being sold and being defined as "Sale Assets."  Said Asset Purchase Agreement is incorporated herein by reference and should be reviewed by parties in interest.

Assets Not Being Sold Pursuant to this Motion.

B.     As contained in the above referenced Asset Purchase Agreement, the following assets are defined as Excluded Assets and are not part of the Sale Assets.  Excluded Assets consist of the following:

Excluded Assets.  The Sale Assets shall not include any of the following assets:

(a)      Causes of action owned by the Seller under 11 U.S.C. § 541, except those causes of action which have been preserved in the Sale Assets contained in Paragraph 1.1(b) and 1.1(c) of the Asset Purchase Agreement;

(b)      Any and all avoidance actions as that term is defined in the United States Bankruptcy Code, including causes of action under 11 U.S.C. § 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 724(a);

(c)      Any cash on hand held by the Seller at the time of the filing of the Bankruptcy;

(d)      The recovery of any cash as a result of accounts receivable held by the Seller for work performed and due as of the date of the bankruptcy petition; and

(e)      All real estate owned by Seller other than the real estate described in Exhibit A of the Asset Purchase Agreement and located at 219 Watlington Drive, Reidsville, North Carolina.

C.      <u>Purchase Price</u>.

(a)      In consideration for the sale, transfer and delivery of the Sale Assets, at the Closing, Purchaser shall deliver to Seller the sum of Two Million, Four Hundred and Twenty Thousand Dollars ($2,420,000.00).   As further consideration, Purchaser has agreed to be responsible for rectifying the Notice of Violation concerning a non-permitted facility/open dump as received from the North Carolina Department of Waste Management (collectively referred to as "Initial Purchase Price").   The Purchase Price shall include any additional amount bid at the sale auction as an upset bid, if any, which adds to the Initial Purchase Price ("Purchase Price").

(b)      The Purchase Price for the Sale Assets shall be $2,420,000 payable as follows:

i.      In cash at Closing via wire transfer to Seller's Debtor in Possession Account less the amount of the Good Faith Deposit (as hereinafter defined), and further reduced by any breakup fee as hereinafter described if the highest bidder at any auction is Foss.

ii.      <u>Allocation of Purchase Price</u>.   The Purchase Price will be allocated $500,000 to the Debtor's Real Property with the balance to the other Sale Assets.

(c)     The Initial Upset Bid must be in an amount equal to at least $125,000.  All bids thereafter shall be at least in $25,000 incremental increases.  If there are no upset bids, then the Purchase Price shall be the Initial Purchase Price.

(d)     <u>Allocation of Sale Proceeds ("Carve Out")</u>.  Of the sale proceeds, $50,000 (the "Carve Out") shall be set aside for the purpose of paying reasonable and necessary cost and expenses for disposing of the Sale Assets and it is agreed said set aside and/or carve out shall not be deemed secured and therefore shall come into the bankruptcy estate free and clear of any claims of lien or other encumbrance.  Furthermore, to the extent there is a higher upset bid at the sale auction, 90% of the upset bid amount in excess of the Initial Purchase Price shall be determined to retain its secured status and 10% shall be determined to be value enhancement as a result of post-petition activities and sale and said 10% shall come into the bankruptcy estate without the attachment of any lien or other encumbrance and shall be available for the benefit of non-secured creditors.

(e)     <u>Breakup Fee</u>.  A Breakup fee shall be paid to Foss in the amount of $100,000 in the event Foss is not the highest bidder at the absolute auction sale; and also, in the event there is an upset bid, Foss becomes an active bidder and becomes the Highest Bidder as stated in the Auction and Sale Procedures attached to the McGoldrick Affidavit filed in this case and incorporated herein by reference.  This fee is to be paid in consideration of the substantial cost and expense incurred by Foss to move forward with the negotiation, preparation of the Asset Purchase Agreement and for entering into and taking on the obligation of leasing the Sale Assets and operating the former business of the Debtor pending the Auction Sale as provided for in the Lease and Operating Management Agreement attached to the McGoldrick Affidavit and incorporated herein by reference, and in consideration of all other pleadings and hearings for which Foss will participate that are necessary to obtain Court approval of the Agreement.  The Asset Purchase Agreement, including the Sale and Auction Procedures and the Lease and Management Operating Agreement have been entered into, subject to Bankruptcy Court approval, and are for the benefit of the Debtor, and the Breakup Fee recognizes the benefit gained by the Debtor and the estate from the same.

(f)     <u>Court Approval</u>. The sale contemplated herein is subject to Court approval of the requested terms of the Asset Purchase Agreement, the Sale and Auction Procedures, and the Lease and Operating Management Agreement and contemplates an order approving the same and

authorizing the Auction Sale (the "Auction and Sales Procedures Order"). Furthermore, this Auction Sale contemplates a final hearing wherein the highest bidder's bid will be confirmed by the Court by entry of the "Sale Approval Order" if it is shown to the Court that the Auction and Sales Procedures Order has been properly followed and the highest bidder was an acceptable bidder.

(g)     No Financing Contingency. The sale contemplated herein is not subject to Purchaser or any acceptable bidder to obtain financing.

(h)     No Due Diligence Contingency. The sale contemplated herein is not subject to completion of due by diligence by Purchaser or any acceptable bidder.

(i)     No Debt Assumption. No assumption of debt is associated with the sale contemplated herein except as set out in the Asset Purchase Agreement.

(j)     No Liens. The Sale Assets shall be transferred to Purchaser free and clear of any liens, claims of lien, encumbrances or other claims or interests, including rights of setoff ("Liens"), with all liens transferred to the proceeds of sale of the Sale Assets, pursuant to 11 U.S.C. § 363.

(k)     **No Representations or Warranties except as noted in the Asset Purchase Agreement. The Sale Assets are being sold "as is," "where is," and "with all faults," and Foss, or any ultimate highest bidder pursuant to any auction or order of the Bankruptcy Court, hereby acknowledges and agrees that, except as otherwise expressly provided in the Asset Purchase Agreement, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Sale Assets. This includes any representation as to the merchantability or fitness of the Sale Assets for any particular purpose. Without in any way limiting the foregoing, Seller hereby disclaims any warranty, expressed or implied, of merchantability or fitness for any particular purpose as to any portion of the Sale Assets. Foss and/or any ultimate highest bidder pursuant to any auction or order of the Bankruptcy Court further acknowledges that said party has conducted an independent inspection and investigation of the physical condition of the Sale Assets and all**

such matters relating to or affecting the Sale Assets as said party deems necessary or appropriate to the extent they desire the same.  The ultimate purchaser will accept the Sale Assets at closing "as is," "where is," and "with all faults."

## REQUESTED AUCTION AND SALE PROCEDURES

14.    The Debtor requests certain specific Auction Procedures relating to the submission and consideration of competing offers ("Upset Bids") be approved by the Court with the entry of a Sale and Auction Procedures Order approving the Asset Purchase Agreement and the Auction Procedures.  The Sale and Auction Procedures is attached as Exhibit A hereto and incorporated herein by reference.

## RELIEF REQUESTED AND APPLICABLE AUTHORITIES

I.        Sale of the Sale Assets Should be Approved under Section 363(b) of the Bankruptcy Code, Subject to Any Acceptable Upset Bids.

15.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Additionally, section 105(a) of the Bankruptcy Code allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

16.    Courts in the Fourth Circuit have permitted pre-confirmation sales of the debtor's property so long as there is a "sound business purpose" for the sale.  See In re The Lady H. Coal Company, Inc., 193 B.R. 233 (Bankr. S.D.W.V. 1996) (applying sound business purpose rule); In re WBQ Partnership, 189 B.R. 97 (Bankr. E.D. Va. 1995) (same); In re Naron & Wagner, 88 B.R. 85 (Bankr. D. Md. 1988) (same).  In other circuits, courts reviewing section 363(b) motions have also typically required that a sound business justification exists for such sale.  See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Stephens Industries, Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986); In re Titusville Country Club, 128

B.R. 396, 399 (Bankr. W.D. Pa 1991). "Section 363(b) of the Code seems on its face to confer upon the bankruptcy judge virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary course of business, of property of the estate." Lionel, 722 F.2d at 1069. In the case of the sale of property, most courts have held that approval of a proposed sale is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor. See, e.g., Lionel, 722 F.2d 1063. "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). See also In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (Balick, B.J.) (section 363(b) requires that a transaction be fair and equitable, have a good business reason, and be in good faith).

17.    Once the debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650,656 (S.D.N.Y. 1992), quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985). The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. See id.; see also In re Manville, 60 B.R. at 615-16 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions").

18.    In addition, under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that it is in the interest of preserving or protecting the value of the debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); Bird v. Crown Convenience (In re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy…is that equitable principles govern") (citations omitted); In re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("The Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the

benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

19.     In this case, a valid business justification exists for the sale of the Sale Assets.  The Debtor, as currently constituted, is not in a position to continue operating in the ordinary course of business as a result of the lack of adequate financing.  The lack of adequate financing does not allow for this Debtor to continue operating or allow it to operate for an extended period of time while it attempts to classically restructure its affairs.  Furthermore, it would be difficult for this Debtor to operate for a limited number of months and during said time to maintain its going concern value while it attempts to market itself for private sale through a business broker or other investment banking party.  Time is therefore of the essence for this Debtor to sell its assets.  The offer which has been presented is one which the Debtor believes is equal to the fair market value of the Sale Assets.  This offer not only results in the Debtor receiving an amount which the Debtor believes is fair compensation but also eliminates the Debtor's obligation to rectify a Notice of Violation as received from the North Carolina Division of Waste Management.  The consideration to be paid and the assumption of this obligation brings the total value of this bid to approximately equal to or greater than $2.9 Million.  In addition to the offer, the Purchaser has agreed to take over operation of the Debtor's business and to therefore be responsible for all costs and expenses of said operations pending the Auction Sale and consummation of said sale.  This portion of the offer is critical for the Debtor to be able to maintain its going concern value.  As indicated above, the Debtor does not have alternative financing which would allow for it to maintain its going concern value while seeking additional private offers.  The Debtor operated through a Receiver for a period of approximately five (5) months prior to the filing of the petition.  During this time, the Receiver actively investigated and attempted to market these assets for sale and, as a result thereof, obtained this offer as the highest and best offer from said efforts.  Furthermore, as a result of said efforts, the Receiver is aware of additional parties who may have an interest in the Debtor's business and might participate at the Auction Sale.  It is the opinion of the Receiver that said parties were not interested in making an offer at that time for reasons which would include the inability of the Seller to resolve existing lien claims and how the Debtor would finance its continued operations pending consummation of the sale.  The Sale Procedures which are being requested herein will remove the issue as it relates to the liens and passing marketable title and in conjunction with this offer, the

Lease and Management Operating Agreement removes the issue of maintaining the going concern value of the business.

20.     Even though the ultimate purchaser is not required to continue employing the employees of the Debtor, upon information and belief, a majority of said employees provide valuable and necessary services for the operations of the Debtor's business and, therefore, it is anticipated that a majority of said employees will retain employment if this offer is accepted, as requested.  This offer is structured so there is a "carve out" provision for non-secured creditors, allows for the sale to go forward, and if there are upset bids, then the bankruptcy estate will receive 10% of the upset bid amount in excess of the Initial Purchase Price, therefore, providing the possibility for an enhanced return to unsecured creditors.  It is the Debtor's opinion that there is no chance for unsecured creditors to receive any distribution from the Sale Assets if the Debtor's business is closed and the assets are either foreclosed or sold by immediate auction sale.

II.     <u>Sale of the Sale Assets Should be Free and Clear of Liens, Claims, Interests and Encumbrances as Permitted by Section 363(f) of the Bankruptcy Code, with said Claims being Transferred to Proceeds of Sale.</u>

21.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtor is seeking authority to sell the Sale Assets free and clear of all liens, claims, interests and encumbrances (collectively, the "Encumbrances"), with such Encumbrances to attach to the proceeds of sale.  Section 363(f) of the Bankruptcy Code provides as follows:

> (f)     The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

       (4)      such interest is in bona fide dispute; or

       (5)      such entity could be compelled, in a legal or equitable
                     proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); see also In re WBQ Partnership, 189 B.R. at 105 (noting that § 363(f) is written in the disjunctive and requires only one of the conditions present be met); In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).  Further, Bankruptcy Rule 6004(f)(1) specifically states that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  See Fed. R. Bankr. P. 6004 (f)(1).

      22.     The Purchase Price provides more than sufficient funds to pay the alleged claim of G.R. Funding.  Said interest and the price at which the alleged collateral is to be sold is greater than the aggregate value of the lien claim of G. R. Funding and, therefore, its lien claim can be transferred to proceeds pursuant to 11 U.S.C. § 363(f)(3).  Furthermore, as indicated, its lien claim is in a bona fide dispute and therefore could also be transferred to proceeds of sale pursuant to 11 U.S.C. § 363(f)(4).

      23.     Carolina Bank holds a secured interest in the Sale Assets and is owed substantially more than the Purchase Price.  Carolina Bank has consented to this sale if the sale takes place pursuant to the terms and conditions requested and, therefore, its claim of lien can be transferred to proceeds pursuant to U.S.C. § 363(f)(2).

      24.     To the extent at the time of sale the lien claims are in dispute, then the Court should instruct the Debtor to escrow an appropriate amount of the Sale Proceeds pending further order of this Court, and the Court shall have the jurisdiction to issue any such orders it deems necessary to further adequately protect the claims of the lien creditors.  Otherwise, to the extent there is no bona fide dispute at the time of closing resulting from an objection to the claim of one of the secured creditors and to the extent said party has filed a proof of claim in this proceeding and there is an agreement as to the amount owed, then the Debtor requests that it have authority to pay such

secured creditor at the time of closing.  If any party is claiming a security interest in the Sale Assets and the Court deems it necessary to determine the secured status and value of the collateral pursuant to 11 U.S.C. § 506, then this Motion shall alternatively be deemed a request by the Debtor to hold an immediate hearing at the time this Motion is being considered for determination of secured status under 11 U.S.C. § 506, and to determine whether liens can be transferred to proceeds of sale for reasons which include 11 U.S.C. § 363(f)(5).

25.     It is the Debtor's position that if any party is claiming a security interest in the Sale Assets and it does not object to the sale, it shall be deemed to have consented to the sale or transfer pursuant to Section 363(f)(2) of the Bankruptcy Code.

III.    The Sale and Auction Procedures, as well as the Breakup Fee, Should be Approved.

26.     Good cause exists to approve the terms and conditions of the Auction Sale, including the auction procedures as described above and the provisions of the Asset Purchase Agreement concerning the Breakup Fee to be paid to Foss, if it is not the highest bidder.  As described herein, the Debtor has engaged in extensive marketing efforts and lengthy negotiations with Foss, as a result of which the Debtor and Foss intend to consummate the Asset Purchase Agreement.  As part of these negotiations, the Debtor explained to Foss that the sale of the Sale Assets would be subject to an auction and to the possibility of higher and better offers being made at the auction.  Foss agreed to this procedure and agreed to enter into the Asset Purchase Agreement only if specified conditions, including the auction procedures containing the bidding procedures along with the Breakup Fee, were agreed to in order to ensure a fair and orderly auction process and to compensate Foss fairly for its fees, costs, expenses and efforts expended in connection with the contemplated acquisition, including the negotiation of the Asset Purchase Agreement and the costs to be incurred in connection with the Auction Sale and the Court approval process.  Furthermore, this offer is further unique in that Foss has agreed to enter into the Lease and Management Operating Agreement to further assist in preserving the going concern value of the Sale Assets.

27.     Historically, bankruptcy courts have approved breakup fees under the "business judgment" rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, e.g., In re 995 Fifth Ave.

Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking").  See also In re Integrated Resources, 147 B.R. 650, 657-58 (S.D.N.Y. 1992), appeal dismissed, 3F.3d 49 (2$^d$ Cir. 1993) (establishing three basic factors for determining whether to permit such fees in bankruptcy: whether (1) relationship of parties who negotiated breakup fee is tainted by self-dealing or manipulation; (2) fee hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to purchase price"); In re Anchor Glass Container Corporation, Case No. 96-01434 (PJW) (Bankr. D. Del. Dec. 12, 1996) (unreported order authorizing breakup fee); In re FoxMeyer Corp., Case No. 96-01329 (HSB) (Bankr. D. Del. Nov. 8, 1996) (same); In re Lomas Financial Corp., Case No. 95-01235 (PJW) (Bankr. D. Del. Jan. 16, 1996) (same).  "[T]he better and more widely held view is that agreeing to such [breakup] fees can be an appropriate exercise of the trustee's business judgment."   3 Collier on Bankruptcy, ¶ 363.02[7] (16th ed. 2013).

28.    In Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527 (3rd Cir. 199), the Third Circuit Court of Appeals established standards for determining the appropriateness of breakup fees and other bidding incentives in the bankruptcy context.  The O'Brien court held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate.  See id. at 533.

29.    The O'Brien court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, a benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  Id. at 537.  Second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.

30.      Whether evaluated under the "business judgment" rule or the Third Circuit's "administrative expense" standard, the bidding procedures and the Breakup Fee should be approved. Foss agreed to enter into the Agreement only if the bidding procedures and the Breakup Fee were agreed to in order to compensate Foss fairly for its fees, costs, expenses and efforts in connection with the contemplated acquisition, including the negotiation of the Agreement and the costs to be incurred in connection with the Court approval process.  The bidding procedures and the Breakup Fee thus have induced a bid that otherwise would not have been made and without which bidding may have started at a lower threshold.

31.      Foss' offer provides a minimum bid on which other potential bidders can rely, thereby increasing the likelihood that the Debtor will receive the highest or best bid for the Sale Assets.  The mere existence of the bidding procedures and the Breakup Fee permits the Debtor to insist that competing bids be materially higher or otherwise better than the Foss' proposal, a clear benefit to the Debtor's estate.

32.      The Debtor believes the bidding procedures and the Breakup Fee are fair and reasonable and should be approved by the Court as part of the Auction and Sales Procedures Order. There is no doubt that Foss' submission of an initial bid - if a higher bid materializes - contributed to the creation of a competitive bidding environment and would be a significant factor in producing any higher bid that may be obtained from a third party at the auction.  Foss has accepted the risk that its opening bid may be rejected if higher and better offers are made and, therefore, the Auction Procedures and the Breakup Fee are warranted.

33.      While the Debtor is requesting to proceed with an auction of the Sale Assets and to solicit any higher and better offers for the Sale Assets, the Debtor believes that the Acceptable Opening Bid made by Foss and the other terms and conditions set forth in the Asset Purchase Agreement are fair and reasonable, and that even if no higher offers are received, the sale of the Sale Assets to Foss on the terms negotiated in the Asset Purchase Agreement is in the best interest of the estate and its creditors and should be approved.  With respect to the Breakup Fee of $100,000, the Debtor submits that this, too, is fair and reasonable under the circumstances, is a necessary cost and expense of preserving the estate, and should be approved.  If Foss is not the Highest Bidder as a result of an Acceptable Upset Bid, then at closing, Foss shall be paid a Breakup Fee of

$100,000.00. If Foss is the ultimate purchaser but the Purchase Price is not the Initial Purchase Price but results from said party actively bidding and making the Highest Acceptable Bid, it shall be entitled to the Breakup fee.

34.     To the extent the payment of the requested Breakup Fee becomes an obligation of the Debtor, the same shall constitute an administrative expense claim under section 503(b) and 507(a)(1) of the Bankruptcy Code and shall be immediately payable in accordance with the provisions of the Auction and Sales Procedures Order.

## MARKETING AND ADVERTISING THE AUCTION

35.     The Debtor will compile a list of companies engaged in the industry and business similar to that of the Debtor and will provide information and notice of the auction sale and the Court approved procedures to solicit further interest in the auction sale to said parties. The Debtor shall further cause to be listed on its website notification of the auction sale and access to the Order Authorizing the Sale and Establishing the Sale Procedures. The Notice of the auction sale which shall be sent to parties engaged in the business shall direct them, if interested, to a contact party from whom they will be provided a due diligence package which prospective bidders can further review upon execution, if necessary, of an appropriate confidentiality agreement. To the extent any party desires to visit the premises, said party shall be allowed to visit as long as it is not disruptive to the Debtor's operations or the auction procedures as contemplated herein.    The due diligence information to be provided shall, among other things, consist of current internal income statement, balance sheet, historical financial finance statements for the years 2013, 2014 and 2015, detailed list of all assets including machinery and equipment and inventory. **A redacted customer list providing the number of customers and the amounts generated for the sale to said customer during the last 24 months shall be provided. The actual names of customers shall be redacted to preserve such confidential information for the ultimate Highest Bidder.**

## NOTICE

36.     To ensure that the highest bidder obtains marketable title and that appropriate due process has been given to creditors, the Debtor requests that the Court direct and approve the Notice requirements for the purpose of providing Notice of the Auction, the Auction and Sales Procedures Order and providing Notice of the Final Hearing.  The Debtor proposes to give notice of the Auction, the Auction and Sales Procedures Order, and the Final Hearing by sending the Notice of Auction, the Auction and Sales Procedures Order and Notice of the Final Hearing by first-class mail, deposited as soon as practicable after the date of the Auction and Sales Procedures Order, to: (a) all potential purchasers with whom the Debtor has received any communication prior to the Chapter 11 petition concerning an interest in the sale of the assets; (b) all attorneys and other parties who have entered an appearance in this case; (c) all secured creditors, (d) applicable taxing authorities, (e) the Unsecured Creditors' Committee and its counsel, if appointed, (f) the Bankruptcy Administrator, and (g) all unsecured creditors in accordance with Bankruptcy Rule 2002(a)(2). The Debtor shall file a certificate of service with the Court showing that it has complied with this notice procedure.

WHEREFORE, the Debtor respectfully requests that the Court enter an Order:

1.      Authorizing the Debtor to conduct an Auction Sale of its Sale Assets described herein upon the terms and conditions set forth in this Motion which would include, but not be limited to, approval of Auction Procedures, approval of the Breakup Fee, scheduling of appropriate hearings, determining appropriate Notice, approving the Lease and Operating Management Agreement, authorizing sale to Foss Industrial Recycling, LLC, or the highest bidder at the Court approved auction, authorizing the sale free and clear of all liens, claims, and encumbrances or other claims of interest with the same being transferred to proceeds of sale, approving the Asset Purchase Agreement, and setting a final hearing for sale, and other related relief as requested herein; and

2.      This verified motion be accepted into evidence in support of the relief requested herein; and

3.      Granting such other and further relief as the Court deems just and proper.


This the 30th day of October, 2015.


                              _s/Charles M. Ivey, III_____
                              Charles M. Ivey, III
                              Attorney for Debtor in Possession
                              NCSB #8333



OF COUNSEL:

IVEY, McCLELLAN, GATTON & SIEGMUND, LLP
P. O. Box 3324
Greensboro, North Carolina 27402
Telephone:  336/274-4658
Facsimile:  336/274-4540

NORTH CAROLINA

GUILFORD COUNTY

VERIFICATION

THOMAS J. McGOLDRICK, being first duly sworn, certifies that he is the Receiver for B. P. Greer Recycling, Inc., and he has read the allegations contained herein and that the same are true except as to those matters and things alleged upon information and belief, and as to those matters and things he believes them to be true, and executes this document in his capacity as Receiver of B. P. Greer Recycling, Inc.

This the _30_ day of _October_, 2015.

B. P. GREER RECYCLING, INC.

By: _Thomas J. McGoldrick_
THOMAS J. McGOLDRICK

NORTH CAROLINA

GUILFORD COUNTY

I, _Melissa Martiere_, a Notary Public in and for said County and State does hereby certify that THOMAS J. McGOLDRICK, personally appeared before me this day and acknowledged the due execution of the foregoing instrument by him in his capacity as Receiver of B. P. Greer Recycling, Inc.

WITNESS my hand and notarial seal, this the _30_ day of _October_, 2015.

_Melissa Martiere_

```
*********************************
*      MELISSA MARTIERE         *
*       NOTARY PUBLIC           *
*    GUILFORD COUNTY, NC        *
*********************************
```

Printed Name: _Melissa Martiere_
Notary Public
My commission expires: _1/25/17_

EXHIBIT A

## SALE AND AUCTION PROCEDURES.

The Bankruptcy Court shall enter an order providing for the following Auction Procedures:

1.    <u>Sale Means</u>.  The sale shall be by means of an absolute auction subject only to confirmation by the Court at the Final Hearing that the Sale and Auction Procedures Order was followed and that an Acceptable Bidder was the Highest Bidder.

2.    <u>Time and Date of Auction</u>.  The auction sale shall take place at 12:00 Noon December 2, 2015, pursuant to the Sale and Auction Procedures Order.  The Sale is intended to close on or before December 22, 2015.  Time is of the essence.

3.    <u>Location</u>.  The auction sale shall take place in the Section 341 creditor room of the United States Bankruptcy Court for the Middle District of North Carolina located at 101 South Edgeworth Street, Greensboro, North Carolina, or such other place as may be ordered by the U.S. Bankruptcy Court for the Middle District of North Carolina.

4.    <u>Acceptable Bidder</u>.  An Acceptable Bidder must be a party who has provided the following on or before seven (7) business days before the auction:

a.    A cash deposit in the amount of $10,000.00.  The Seller's attorney shall deposit said funds in a separate bank account which is FDIC insured and in a bank which is approved as a designated depository in bankruptcy matters.  Seller's attorney shall cause all deposits to be returned within three (3) business days following the auction date if said depositor is not the Highest Bidder.  The deposit shall be returned by first-class mail to the address and entity which the Acceptable Bidder in writing has instructed the attorney for the Seller to return the deposit. If an Acceptable Bidder desires that the deposit be returned by wire transfer then said instructions for wire transfer shall be provided to Seller's attorney upon submission of the deposit.  Failure of the Acceptable Bidder to provide proper instructions for the return of deposit will authorize Seller's attorney to hold said deposit pending written instructions.

b.    In conjunction with the submission of deposits, any party desiring to be an Acceptable Bidder shall deliver evidence establishing to Seller's satisfaction such prospective bidder's financial ability to consummate the sale in a timely manner if such bidder becomes the Highest Bidder at the absolute Auction Sale.

c.    Upon receipt of the deposit and evidence of ability to consummate, Seller shall promptly provide to such person ("Prospective Upset Bidder") copies of the Motion, the Asset Purchase Agreement and the Sale and Auction Procedures Order.

d.       The Seller shall promptly provide the name of each Prospective Upset Bidder to Foss Industrial Recycling, LLC ("Foss"), the Unsecured Creditors' Committee, the Bankruptcy Administrator, and Carolina Bank or any other creditor who, by written request to Seller's attorney, requests to be provided the names of Prospective Upset Bidders.

e.       The Seller shall promptly but no later than three (3) business days of receiving the deposit and evidence of ability to consummate, inform the Prospective Upset Bidder whether the Seller designates the Prospective Upset Bidder as an Acceptable Bidder or takes the position, based upon evidence presented, that said party should not be so designated.

f.       Foss shall be deemed an Acceptable Bidder based upon its execution of the Asset Purchase Agreement.

5.       <u>Acceptable Opening Bid</u>.  The opening acceptable bid shall be deemed to be made by Foss upon the terms and conditions set forth in the Asset Purchase Agreement.  Therefore, said amount shall equal Two Million Four Hundred Twenty Thousand Dollars ($2,420,000.00) plus the obligation to rectify the Notice of Violation concerning a non-permitted facility/open dump as received from the North Carolina Department of Waste Management (the "Notice of Violation").

6.       <u>Acceptable Upset Bids</u>.  An Acceptable Upset Bid may be made by an Acceptable Bidder.  The first Acceptable Upset Bid made after the Acceptable Opening Bid must be in an amount equal to or greater than $125,000 in excess of the Acceptable Opening Bid amount of $2,420,000.00. Any acceptable Upset Bid will also include assumption of the obligation to rectify the Notice of Violation.  Thereafter, any Acceptable Upset Bids must exceed the previous Acceptable Upset Bid by an amount equal to or greater than $25,000.  An Acceptable Upset Bid must be a bid to purchase all of the Sale Assets under the terms and conditions set forth in the Asset Purchase Agreement as approved by the Court.  (Such bid shall hereinafter be referred to as "Acceptable Upset Bid").  (The ultimate highest bidder shall be referred to herein as the "Highest Bidder.")

7.       <u>Acceptable Bidder Dispute Resolution</u>.  The Bankruptcy Court shall hold a hearing within ten (10) days in advance of the auction date to hear and resolve any dispute which may exist between a Prospective Upset Bidder and the Seller as to whether said Prospective Upset Bidder should be designated an Acceptable Bidder.  The Court retains the jurisdiction to determine such other times and dates as it deems appropriate to hear any dispute relative to a Prospective Upset Bidder, and said hearing may be held upon an emergency notice as deemed appropriate in the sole discretion of the Bankruptcy Court.

8.       <u>How to Make Upset Bid</u>.    To be considered a valid Acceptable Upset Bid, the following is required:

a.       The Upset Bid shall be made by a person or persons who satisfy the conditions set forth in the Sale and Auction Procedures Order to qualify as an Acceptable Bidder.  Foss

is deemed to qualify as an Acceptable Bidder and shall be deemed to qualify as such for all purposes of participating in the Auction;

b.      The Acceptable Upset Bid made by the Highest Bidder shall remain open and be irrevocable through the Final Hearing and, if it is determined at such hearing to be approved as the final Acceptable Bid, it shall remain open and be irrevocable through the date of closing;

c.      Upon being deemed the Highest Bidder at the auction sale, said Acceptable Bidder shall execute the Asset Purchase Agreement and a representation and agreement that its highest bid has been submitted pursuant to the terms and conditions of the Sale and Auction Procedures Order, and that said terms and conditions of the Asset Purchase Agreement are agreed to.

d.      The Acceptable Upset Bid or Bid of the Highest Bidder is not subject to any upset bid after the close of the absolute auction or at the Final Hearing.

9.      <u>Procedures if No Acceptable Upset Bid is Received</u>.  If no Acceptable Upset Bid is received, then the Asset Purchase Agreement's Initial Purchase Price shall be deemed the highest and best offer for the Sale Assets and shall therefore be submitted for approval by the Court at the Final Hearing.

10.     <u>Highest Bidder Deposit</u>.  The Acceptable Bidder who submits the Highest Acceptable Bid, and is therefore the Highest Bidder, shall cause to be deposited with the Seller an amount equal to ten percent (10%) of the bid which has been deemed to be the highest and best offer.  Said deposit shall be submitted to and shall represent good funds on deposit with the Seller on or before Noon on the third (3rd) day prior to the hereinafter described Final Hearing.  If said Final Hearing is held less than three (3) days after the auction sale, then said deposit shall be submitted on or before Noon of the day prior to the hereinafter described Final Hearing.

11.     <u>Court Hearings</u>.

a.      <u>Initial Sale Hearing</u>.  An initial sale hearing is requested to be held by the Court on an expedited basis which will approve the sale of the Sale Assets, the requested Auction Procedures, deem Foss to be an Acceptable Bidder, and deem Foss' bid as the Acceptable Opening Bid.

b.      <u>Final Hearing/Confirmation Hearing</u>.  A final hearing will be held five (5) business days after the auction date or as soon thereafter as can be scheduled by the Court.  It shall be the purpose of said hearing to confirm that the procedures as set forth in the Sale and Auction Procedures Order have been followed by the Seller and the Auction conducted in accordance with the same, and to make such findings as are necessary to provide the purchaser with an order that properly passes title in accordance with the terms and conditions of the Asset Purchase Agreement and the order approving same.  This hearing shall hereinafter be referred to as "Final Hearing."

c.    <u>Closing Date</u>.  The closing date shall be deemed to be the date upon which the consideration is paid and all closing documents are signed.  This may take place immediately after the Final Hearing/Confirmation Hearing but must occur within ten (10) days of the Final Hearing/Confirmation Hearing and on or before December 22, 2015.

d.    <u>Absolute Sale</u>.  This auction shall be an absolute sale and not subject to upset bid after the auction. Cause exists to allow for the Court to waive the stay provided for in Bankruptcy Rules 6004(h) and 6006(d), in order that the order authorizes the Seller to close this sale immediately upon entry of the order approving the sale following the Final Hearing.

e.    <u>Necessary Findings for Purchaser</u>.  A sale conducted pursuant to the procedures set forth herein shall result in the Sale Assets being sold to the Highest Bidder as a good-faith purchaser.  Said purchaser shall acquire all rights as can be conveyed pursuant to 11 U.S.C. § 363 including, but not limited to, the rights of a good faith purchaser pursuant to 11 U.S.C. § 363(m) and a finding, based upon the sworn representation of the Highest Bidder, that the bidding was not pursuant to any improper collusive bidding practices which would not allow for the sale to be avoided for reasons which would include 11 U.S.C. § 363(n).

12.    <u>Dispute Resolution</u>.  The United States Bankruptcy Court shall retain exclusive jurisdiction to resolve any disputes which may arise concerning the Auction Procedures or other issues relevant to the Seller's sale of the Sale Assets as outlined herein.

13.    <u>Emergency Court Hearing with Notice and Hearing</u>.  The Auction Procedures Order shall authorize the Court to hold emergency hearings to resolve any disputes that may arise prior to the auction.  These emergency hearings would include, but not be limited to, any hearing as to whether a party should be designated as an Acceptable Bidder.  All such emergency hearings shall be held on Notice and Hearing as determined by the Court to be necessary under the circumstances and may include limited notice and/or telephonic notice to the designated parties.  Where deemed necessary, the Sale and Auction Procedures Order shall allow for ex parte orders to be issued by the Court to aid and assist in the consummation of the Sale.

14.    <u>Breakup Fee</u>.  If Foss Industrial Recycling, LLC is not the Highest Bidder as a result of an Acceptable Upset Bid, then at closing Foss Industrial Recycling, LLC shall be paid a Breakup Fee of $100,000.  If Foss is the ultimate purchaser but the Sale Price is not the Initial Purchase Price but results from said party actively bidding and making the Highest Acceptable Bid, it shall be entitled to the breakup fee.